UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHAWN TOMPKINS,

                  Plaintiff,

-v-

METRO-NORTH COMMUTER RAILROAD,

                  Defendant.

16-CV-9920 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiff Shawn Tompkins brings this action alleging that Defendant Metro-North Commuter Railroad ("Metro-North" or "the railroad") violated the whistleblower provisions of the Federal Railroad Safety Act ("FRSA"), 49 U.S.C § 20109, by suspending him in retaliation for his protected activities of reporting and refusing to work in unsafe working conditions. Tompkins also brings a civil conspiracy claim against the railroad for having conspired to retaliate against him in violation of the FRSA. Metro-North moves for summary judgment. For the reasons that follow, the motion is granted.

I.  **Background**

The following facts are drawn from the parties' Rule 56.1 statements. They are not subject to genuine dispute unless otherwise noted.

    A.  **The Parties**

Metro-North Commuter Railroad operates a commuter railroad service that serves New York and Connecticut, and the railroad operates in all but the most inclement weather. (Dkt. No. 38 ¶¶ 8–9.) Shawn Tompkins has been an employee of Metro-North since 1988. (Dkt. No. 38 ¶ 1.) Since at least 1989, he has served the railroad in the capacity of "carman." (Dkt. No. 38 ¶ 3.) A carman's primary responsibility is to perform mechanical work on trains. (Dkt. No. 38 ¶

1

4.) While the parties dispute the extent to which Tompkins' specific position requires him to conduct his work outside (Dkt. No. 38 ¶ 5; Dkt. No. 37-8 ¶¶ 6–7), the parties do not genuinely dispute that the railroad expects carmen such as Tompkins to appear at work and perform their requisite duties in all weather conditions. (Dkt. No. 38 ¶ 9; *see also* Dkt. No. 37-1 ("Plaintiff's Deposition") at 107:22–108:3.) At the time he filed suit, Tompkins continued to be employed with the railroad as a carman. (Dkt. No. 38 ¶ 6; Dkt. No. 42 ¶ 153.)

Prior to the 2014 incidents at issue in this case, Tompkins had a history of raising safety complaints regarding conditions at his work site, the Croton Harmon rail yard, which held monthly safety meetings. (*See generally* Dkt. No. 38 ¶¶ 11–31.) For example, in 2012 Tompkins voiced concerns to his supervisors regarding the unsafe use or overexertion of certain lift equipment. (Dkt. No. 38 ¶¶ 12, 18.) In response to each of these complaints, Metro-North either purchased or built new equipment with the capacity to safely perform all necessary functions. (Dkt. No. 38 ¶¶ 16, 19.) Also, as early as 2011, Tompkins alerted the railroad to the accumulation of pigeon feces near workers' lockers, in response to which the railroad established a cleaning schedule and hired an outside contractor. (Dkt. No. 38 ¶¶ 21, 23; Dkt. No. 42 ¶ 165.) Finally, at various unidentified times dating back at least to 2012, Tompkins raised complaints regarding the presence of water near high-voltage wires and the accumulation of debris in work pits at the shop at the Croton Harmon rail yard, concerns the railroad determined were adequately addressed by existing railroad policies. (Dkt. No. 38 ¶¶ 25–29.)

Tompkins was never formally disciplined following his reporting of these safety concerns. In fact, Tompkins had never been subject to any discipline at all in his 26 years with the railroad until the 2014 incidents at issue in this case. (Dkt. No. 42 ¶ 155.) However, Tompkins does describe a number of informal "personal retaliatory actions" he claims his

2

supervisors directed at him in response to his persistent safety complaints. (Dkt. No. 38 ¶¶ 31–40.) For example, Tompkins points to the forced removal of a television unit from his locker, his delayed receipt of pay for preapproved vacation days, and a ban on him driving his personal vehicle around the Croton Harmon site as indicative of his supervisors' dissatisfaction with his history of reporting safety concerns to the railroad. (*Id.*; *see also* Dkt. No. 42 ¶¶ 181–84.)

      **B.**    **The Disciplinary Incidents**

Tompkins' claims against Metro-North stem from two 2014 incidents that led to the railroad taking disciplinary action against him.

      **1.**    **The January 18, 2014 Incident and Subsequent Disciplinary Proceedings**

Tompkins was supposed to work a 4:00 p.m. to 12:00 a.m. shift at the Croton Harmon site on the night of January 18, 2014. (Dkt. No. 38 ¶ 41.) The week leading up to January 18, 2014 had been a snowy one, but because the railroad's trains were operating, the railroad required all employees to report to work and perform their assigned duties as usual on that date. (Dkt. No. 38 ¶¶ 43–44.) It is normal practice for the railroad to salt, plow, and clear all roads and walkways at Croton Harmon, and Tompkins does not present any evidence to counter the railroad's assertion that it had done so prior to the night of January 18, 2014, but he does dispute the extent to which the site's roads and walkways remained icy when his 4:00 p.m. shift began that night. (*Id.*) Tompkins traveled to the Croton Harmon site for his shift via his personal vehicle, which he parked in the employee parking lot, and he walked the approximately 528 feet from his vehicle to his normal work location, Building 4 at the Croton Harmon site, where he arrived on schedule. (Dkt. No. 38 ¶ 41; Dkt. No. 42 ¶ 154; Dkt. No. 37-8 ¶¶ 8–9.)

At some point midway through Tompkins' shift, General Foreman Greg Lewis instructed Tompkins and two of his fellow carmen, Michael Miller and Henry Stubing, to go to another

3

location at the Croton Harmon site, the "Wheel True." (Dkt. No. 38 ¶ 47; Dkt. No. 42 ¶¶ 194, 196; Dkt. No. 37-8 ¶ 14.) The Wheel True is a wheel shop approximately three-quarters of a mile from Building 4. (Dkt. No. 42 ¶¶ 197–98.) The railroad requires carmen to work at the Wheel True at least three times per week (Dkt. No. 38 ¶ 50), and Tompkins attests that he had himself walked to the Wheel True hundreds of times prior to the night of January 18, 2014. (Dkt. No. 42 ¶ 210.) There are multiple ways to walk between Building 4 and the Wheel True, some of which are partially indoors. (Dkt. No. 38 ¶ 48.) In addition to walking, carmen can travel to and from the Wheel True via personal vehicle or via the railroad's company vehicle. (Dkt. No. 38 ¶ 51; Plaintiff's Deposition at 30:14–31:25.)

Upon being told to go to the Wheel True, Stubing went to retrieve the company vehicle to transport himself and his fellow carmen, but he discovered that the company vehicle was out of service. (Dkt. No. 42 ¶ 201.) Stubing and Tompkins then went to Foreman Lewis' office to inform him that the company vehicle was unavailable and to request alternative transportation to the Wheel True. (Dkt. No. 38 ¶ 56; Dkt. No. 42 ¶ 202.) Lewis instructed the carmen to walk to the Wheel True. (Dkt. No. 42 ¶ 203.) Tompkins refused to do so, citing the cold weather and icy conditions on Croton Harmon's walkways. (Dkt. No. 38 ¶ 58; Dkt. No. 42 ¶ 208.)

In response to Tompkins' concerns, Foreman Lewis went to speak to his fellow General Foreman, Frank Palmietto. (Dkt. No. 38 ¶ 59.) The foremen agreed to contact their supervisor, Superintendent Arinda Vasquez, who instructed the foremen that if they believed it safe enough to do so, they should order the carmen to walk to the Wheel True after giving them a safety briefing. (Dkt. No. 38 ¶ 64.) The foremen determined it was safe enough to walk, and then paged the carmen back to their office—where they were joined by another foreman, Brian

Mahoney—and again directed them to walk to the Wheel True. (Dkt. No. 38 ¶¶ 65–67; Dkt. No. 42 ¶ 220.)

The other two carmen present, Miller and Stubing, both agreed to walk to the Wheel True (Dkt. No. 38 ¶¶ 68–69; Dkt. No. 42 ¶ 215), but Tompkins again refused. (Dkt. No. 38 ¶ 70.) Tompkins warned Miller and Stubing that their agreeing to walk might lead to their being forced to walk to the Wheel True "all the time." (Dkt. No. 38 ¶ 72; Dkt. No. 37-8 ¶ 27.)[1] Foreman Lewis, on the instructions of Superintendent Vasquez, ordered Tompkins "out of service" for refusing to walk, and Tompkins swiped out, ending his shift. (Dkt. No. 38 ¶¶ 73–74; Dkt. No. 42 ¶¶ 226–227.)

Foreman Lewis then gave Miller and Stubing a "Job Safety Briefing" on how to walk safely in winter conditions. (Dkt. No. 38 ¶ 76.) Stubing and Miller ultimately drove to the Wheel True in Miller's personal vehicle. (Dkt. No. 38 ¶ 77.) Foreman Palmietto walked to the Wheel True, where he met Stubing and Miller. (Dkt. No. 38 ¶ 78.) All three men returned to Building 4 from the Wheel True in Miller's car. (Dkt. No. 38 ¶ 79.) The parties do not dispute that the men arrived back at Building 4 safely, but the parties do dispute whether the men slipped at all while traveling to and from the Wheel True. (Dkt. No. 42 ¶¶ 229–30.)

Following this incident, Tompkins was held out of service by Superintendent Vasquez pending an investigation into his refusal to walk to the Wheel True. (Dkt. No. 38 ¶¶ 82, 107.) The railroad's investigation consisted of obtaining written statements from the five other witnesses to the incident (carmen Miller and Stubing, and Foremen Palmietto, Lewis, and

---

[1] Tompkins testifies that he told his coworkers that they would be asked to walk "*under such unsafe conditions* all the time" if they agreed to walk that night (*see* Dkt. No. 37-8 ¶ 27 (emphasis added)), although no other witness to the events of January 18, 2014 recalls Tompkins using the word "safe" during the exchange. (Dkt. No 38 ¶ 83.)

5

Mahoney), all of whom reported the incident as having occurred substantially as recounted above. (Dkt. No. 38 ¶¶ 83–88.) Following the close of the investigation, the railroad charged Tompkins with insubordination and failure to perform assigned duties. (Dkt. No. 38 ¶ 106.) The railroad held a pre-trial meeting with Tompkins on January 27, 2014, where he rejected the railroad's offered term of a suspension and opted to contest the charges in a disciplinary hearing. (Dkt. No. 38 ¶ 108.) At that time, Tompkins was reinstated to service pending the outcome of the disciplinary hearing. (Dkt. No. 38 ¶ 109.) Tompkins' disciplinary hearing was held on February 18, 2018. (Dkt. No. 38 ¶ 110.)[2] The railroad assessed Tompkins with a ten-day actual suspension and twenty-day deferred suspension, which on appeal was reduced to an eight-day time-served suspension. (Dkt. No. 38 ¶¶ 119–120.) An arbitration panel upheld Tompkins' eight-day suspension. (Dkt. No. 38 ¶ 121.)

### 2. The February 16, 2014 Incident and Subsequent Disciplinary Proceedings

On February 16, 2014, two days prior to his February 18, 2014 disciplinary hearing, Tompkins approached Foreman Frank Palmietto in the Building 4 lunchroom. (Dkt. No. 38

---

[2] Tompkins and the railroad do not genuinely dispute that Tompkins' disciplinary hearing was conducted in compliance with his union's collective-bargaining agreement with the railroad, but Tompkins challenges the overall fairness of the hearing procedures set out in that agreement, questioning whether those procedures are in fact "fair and impartial." (*See, e.g.*, Dkt. No. 38 ¶¶ 95, 97–102, 112.) Whatever the merits of the specific hearing procedures concededly bargained for by his union and complied with by the railroad, they are immaterial to this case because those preexisting procedures cannot be attributed to any retaliatory animus against Tompkins on the part of the railroad. Tompkins also avers that the hearing officer's specific conduct in his case otherwise deviated from normal protocol, but he bases that contention entirely on his own testimony as to the nature of those protocols. (*See, e.g.*, Dkt. No. 38 ¶ 98.) Given that Tompkins concedes he had no experience with the railroad's disciplinary processes at all prior to the January 2014 incident, his testimony as to the railroad's disciplinary protocols lacks foundation, is contradicted by all other evidence in the record on that point, and thus is insufficient to create a genuine dispute of fact. (Dkt. No. 42 ¶¶ 155, 234; *see also* Dkt. No. 31-18 at 51–52; Dkt. No. 31-19 at 2.)

¶¶ 122–23.) Tompkins asked to speak with Palmietto regarding the upcoming hearing, and Palmietto agreed to do so. (Dkt. No. 38 ¶¶ 123, 125.) While the parties dispute the precise nature of the subsequent exchange between Palmietto and Tompkins, the parties agree that Tompkins questioned Palmietto as to the substance of his report of the January 18, 2014 incident and apparent discrepancies between Palmietto's account and other witness statements. (Dkt. No. 38 ¶ 126.) Palmietto felt threatened by Tompkins' conduct during the exchange, and he reported the exchange to Superintendent Vasquez. (Dkt. No. 38 ¶¶ 131–132.) Tompkins denies having threatened Palmietto, but he concedes that Palmietto seemed "rattled" by their conversation, which Tompkins attributes to Palmietto's having learned of the apparent discrepancies between his written statement and other witness statements. (*Id.*)

Superintendent Vasquez's investigation into the lunchroom incident consisted solely of an interview with Palmietto. (Dkt. No. 38 ¶ 133.) Following Tompkins' February 18, 2014 hearing regarding the Wheel True incident, Superintended Vaquez initiated new charges against Tompkins on behalf of the railroad in connection with the lunchroom incident, charging Tompkins with "conduct unbecoming a Metro-North employee and disregard of the company's interests." (Dkt. No. 38 ¶ 135.) Tompkins was again taken out of service pending the outcome of this new set of charges, and he refused the railroad's offered term of suspension and opted to contest the charges in a disciplinary hearing. (Dkt. No. 38 ¶ 136.) Following a March 4, 2014 disciplinary hearing, the railroad assessed Tompkins with a twenty-day actual suspension and thirty-day recorded suspension. (Dkt. No. 38 ¶¶ 137, 145.) On appeal, the suspension was reduced to ten days of time served, and an arbitration panel subsequently overturned all discipline and awarded Tompkins back pay. (Dkt. No. 38 ¶¶ 146–47.)

As of the time Metro-North filed its motion for summary judgment in February 2018, Tompkins was working with the railroad in the same position and with the same duties and shift as he had been prior to the incidents at issue in this case. (Dkt. No. 38 ¶ 148.) Tompkins has not been subject to any further discipline by the railroad since these incidents. (*Id.*)

## II. Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is genuine whenever, considering the record as a whole, a rational jury could find in favor of the non-moving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

In reviewing a motion for summary judgment, a court must consider the evidence "in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995). "It is well established that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'" *Curry v. City of Syracuse*, 316 F.3d 324, 333 (2d Cir. 2003) (alteration in original) (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)).

## III. Discussion

### A. Tompkins' FRSA Claims (Counts I and II)

The FRSA provides a private right of action to railroad employees "discharge[d], demote[d], suspend[ed], reprimand[ed], or in any other way discriminate[d] against . . . for (A) reporting, in good faith, a hazardous safety or security condition; [or] (B) refusing to work when

8

confronted by a hazardous safety or security condition related to the performance of the employee's duties." 49 U.S.C § 20109(b)(1); *see also id.* § 20109(d)(3) (creating an employee's private right of action).

Courts evaluate FRSA retaliation claims under the burden-shifting test set out in the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, 49 U.S.C. § 42121(b)(2)(B). *See* 49 U.S.C. § 20109(d)(2)(A)(i); *see also Hernandez v. Metro-North Commuter R.R.*, 74 F. Supp. 3d 576, 579 n.1 (S.D.N.Y. 2015). To prevail under this standard, a FRSA plaintiff must first make a prima facie showing by a preponderance of the evidence "that (1) [the plaintiff] engaged in protected activity; (2) the employer knew that [the plaintiff] engaged in the protected activity; (3) [the plaintiff] suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action." *Hernandez*, 74 F. Supp. 3d at 579 (alterations in original) (quoting *Bechtel v. Admin. Review Bd.*, 710 F.3d 443, 447 (2d Cir. 2013)). "If the plaintiff satisfies all of the requirements, 'then the burden shifts to the employer to demonstrate by clear and convincing evidence that the employer would have taken the same personnel action in the absence of the protected activity.'" *Lockhart v. Long Island R.R. Co.*, 266 F. Supp. 3d 659, 663 (S.D.N.Y. 2017) (quoting *Conrad v. CSX Transp., Inc.*, 824 F.3d 103, 107 (4th Cir. 2016)), *appeal filed* No. 17-2725 (2d Cir. Aug. 31, 2017).

Tompkins brings two FRSA claims against Metro-North: Count I, which is premised on the disciplinary proceedings relating to the January 18, 2014 Wheel True incident (Dkt. No. 1 ¶¶ 70–74), and Count II, which is premised on the February 16, 2014 lunchroom incident. (Dkt. No. 1 ¶¶ 75–79.) Tompkins claims that Metro-North unlawfully retaliated against him in both instances by disciplining him for his protected conduct of refusing to walk to the Wheel True in

9

unsafe conditions or, alternatively, for bringing those unsafe conditions to the attention of the foremen on duty in the first place. The railroad moves for summary judgment as to both counts.

### 1. Tompkins' Refusal to Walk to the Wheel True

Metro-North moves for summary judgment with respect to Tompkins' allegation that his January 18, 2014 refusal to walk to the Wheel True was protected under the FRSA. (Dkt. No. 36 at 12–15.) In order to defeat summary judgment and establish that his refusal to work was "protected," Tompkins must show that "a reasonable individual in the circumstances then confronting [him] would conclude that (i) the hazardous condition present[ed] an imminent danger of death or serious injury; and (ii) the urgency of the situation d[id] not allow sufficient time to eliminate the danger without such refusal." *See* 49 U.S.C. § 20109(b)(2). In evaluating the objective reasonableness of a FRSA plaintiff's conduct, courts assume the perspective of one with "the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee." *Hernandez*, 74 F. Supp. 3d at 580 (quoting *Nielsen v. AECOM Tech. Corp.,* 762 F.3d 214, 221 (2d Cir. 2014)). When a "plaintiff has failed to satisfy the reasonable belief factor required to establish a protected activity under the FRSA, [a] defendant's motion for summary judgment should be granted." *Id.*

The record before the Court on summary judgment is replete with "reasonable person[s] in the same factual circumstances [and] with the same training and experience as" Tompkins concluding that one could safely walk from Building 4 to the Wheel True on the night of January 18, 2014. *Id.* (quoting *Nielsen*, 762 F.3d at 221). In fact, other than Tompkins, every individual cited in the record to have evaluated the situation on the night of January 18, 2014, including at least four other Metro-North employees present that night, two Metro-North hearing officers, and an arbitration panel, all agreed that walking to the Wheel True that night was not unsafe.

The record includes the testimony of four railroad employees present for the incident involving Tompkins regarding the walking conditions around the Croton Harmon site on January 18, 2014, and all four either agreed to or did themselves actually walk from Building 4 to the Wheel True. The two Metro-North foremen supervising Tompkins that night evaluated the weather conditions and decided that the carmen could safely walk from Building 4 to the Wheel True prior to asking the carmen to do so; indeed, one of those foremen himself walked to the Wheel True from Building 4 immediately following Tompkins' refusal. (Dkt. No. 38 ¶¶ 64, 67, 78.)[3] And the two other carmen working the same shift as Tompkins also willingly agreed to walk to the Wheel True just prior to Tompkins' refusal. (Dkt. No. 38 ¶¶ 68–69.)

Moreover, the reasonableness of these individuals' assessments was then reviewed and affirmed by two other Metro-North employees and an arbitration panel as part of Tompkins' disciplinary process. (Dkt. No. 38 ¶¶ 119–121; Dkt. No. 31-24 at 1–4.) One of those Metro-North employees concluded that "[b]ased on the [railroad's] substantial evidence, [Tompkins'] defense contending the presence of unsafe weather conditions lacks merit." (Dkt. No. 31-24 at 3.) And the arbitration panel, reviewing the same evidence now before the Court on summary judgment, found that the "evidence does not suggest there was any safety risk involved in complying with [the foremen's] instructions," concluding that "the record supports [Metro-North's] contention that the pathway was safe. . . . While [Tompkins] now claims a safety concern, the record simply does not support his contention." (Dkt. No. 31-25 at 6–7.)

---

[3] The arbitration panel reviewing Tompkins' disciplinary appeal also referenced a third foreman who was present for the January 18, 2014 incident who appears to have agreed with his two colleagues' "determination that the walking conditions to the Wheel True were suitable and safe." (Dkt. No. 31-25 at 3.)

Tompkins rebuts the conclusions of all of these parties with only generalized allegations that the walkways at the Croton Harmon site remained icy and that the employees quoted above had themselves slipped on ice the night of January 18, 2014. (Dkt. No. 38 ¶¶ 78–79.) But Tompkins' own subjective assessment of the danger of the iciness of his worksite's pathways, supported by no evidence other than his own testimony and contradicted by all others present at the scene and all others to have since reviewed the events of that evening, including some of the same employees he describes as having slipped outside the Wheel True (*see, e.g.*, Dkt. No. 34 ¶ 3), is insufficient to create a genuine dispute of material fact with respect to the objective reasonableness of his refusal to work. Accordingly, to the extent Tompkins' FRSA retaliation claims are premised on his refusal to work, the Court concludes that the evidence produced by Tompkins is insufficient "to satisfy the reasonable belief factor required to establish a protected activity under the FRSA, and [Metro-North's] motion for summary judgment should be granted." *Hernandez*, 74 F. Supp. 3d at 580.[4]

### 2. Whether Tompkins' Safety Complaints were Contributing Factors to any Unfavorable Personnel Action

Though Tompkins' refusal to walk to the Wheel True was not a protected activity under the FRSA, Tompkins might still be able to maintain FRSA claims against Metro-North if the railroad retaliated against him for the undisputedly protected activity of "report[ing] the unsafe walking conditions and ask[ing] for means of transportation to" the Wheel True. (Dkt. No. 1 ¶¶ 71, 76.) The railroad moves for summary judgment with respect to whether Tompkins has

---

[4] Even if Tompkins could establish that a danger sufficient to satisfy FRSA 49 U.S.C. § 20109(b)(2)(B)(i) existed, the Court also notes that the other two carmen were able to "eliminate the danger" in accordance with 49 U.S.C. § 20109(b)(2)(B)(ii) by driving a personal vehicle to the Wheel True. (Dkt. No. 38 ¶ 77.) Tompkins concedes that he did not request permission to drive to the Wheel True and thereby eliminate the danger posed by walking, though the parties do dispute Tompkins' reasons for not doing so. (Dkt. No. 38 ¶ 75.)

produced sufficient evidence to allow a reasonable jury to conclude that Tompkins' safety complaints regarding the icy conditions at the Croton Harmon site, separate and apart from his refusal to walk, were "contributing factors" to the two suspensions forming the bases of Counts I and II. (Dkt. No. 36 at 15–18, 21–23.)

To establish a contributing factor, a FRSA plaintiff must produce evidence identifying "intentional retaliation prompted by the employee engaging in protected activity." *Lockhart*, 266 F. Supp. 3d at 663 (quoting *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 791 (8th Cir. 2014)). The "contributing factor" need not be the sole factor influencing the adverse employment action, and establishing a contributing factor does not require a showing of retaliatory motive. *Araujo v. N.J. Transit Rail Ops., Inc.*, 708 F.3d 152, 158 (3d Cir. 2013). But courts considering FRSA claims have held that "more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." *Kuduk*, 768 F.3d at 792 (internal quotation marks omitted). "In considering [the contributing factor] element, [courts] must take into account the evidence of the employer's nonretaliatory reasons." *Gunderson v. BNSF Ry. Co.*, 850 F.3d 962, 969 (8th Cir. 2017) (internal quotation marks omitted).

In *Gunderson*, the Eight Circuit upheld a district court's summary judgment dismissal of an FRSA retaliation claim based on the plaintiff's failure to produce sufficient evidence to establish the "contributing factor" element of his prima facie burden. *Id.* at 970. The defendant railroad had discharged the employee after he harassed witnesses involved in an ongoing and unrelated railroad disciplinary proceeding. *Id.* at 964–66. The discharged employee then brought a FRSA action against the railroad, alleging "that his discharge was unlawful retaliation for his repeated complaints about safety problems" at the railroad. *Id.* at 967. In affirming the

district court's grant of summary judgment, the Eighth Circuit emphasized "five highly relevant facts":

> First, the disciplinary investigations that led to [plaintiff's] discharge were completely unrelated to his protected activity. Second, [plaintiff's] prior safety-related activities were remote in time and disconnected from the disciplinary proceedings by an intervening event that independently justified adverse disciplinary action. . . . Third, [plaintiff] was discharged after disciplinary hearings at which he was represented by union counsel, and the decisions to discharge were upheld by [the railroad] internally and by a[n] . . . arbitration panel. Fourth, the merits of the discharge were again reviewed in a six-day hearing before a [Department of Labor administrative law judge]. . . . Fifth, the decision to discharge was made by [a railroad division manager] after consulting with his supervisors and with [railroad] human relations officers, not by . . . the lower-level supervisors [plaintiff] accuses of safety-related bias.

*Id.* at 969 (internal quotation marks and citations omitted).

Similar factors weigh in Metro-North's favor here. The Court begins with Count I, which is premised on Tompkins' suspension following his refusal to walk to the Wheel True.[5] With respect to Count I, factor three weighs in the railroad's favor because, as in *Gunderson*, Tompkins was represented by his union throughout the disciplinary proceedings, and the resulting suspension was upheld both by the railroad internally and by an arbitration panel. (Dkt. No. 38 ¶¶ 108, 113, 120–121.) Similarly, factor five weighs in the railroad's favor because Tompkins makes no showing that any of the lower-level supervisors accountable for addressing Tompkins' safety complaints played a decision-making role in the adjudication of the charges against him. (Dkt. No. 38 ¶¶ 117–121.) Factor four is inapposite, given that the Department of

---

[5] The Court emphasizes that this analysis concerns only whether Tompkins has adduced evidence sufficient to show that his *reporting* of the icy walkways at Croton Harmon contributed to the railroad's disciplinary charges, in contrast to his *refusal to walk* in those icy conditions, which concededly was the basis for Tompkins' discipline but was not protected conduct under the FRSA for the reasons addressed above.

14

Labor never completed its investigation into Tompkins' petition to the Occupational Safety and Health Administration. (Dkt. No. 1 ¶ 8.)

Turning to *Gunderson* factors one and two—which concern the temporal and substantive connection between an FRSA plaintiff's protected conduct and subsequent adverse employment action—the Court is mindful that "[a]n intervening event between the protected activity and the adverse employment action may defeat the inference of causation where temporal proximity might otherwise suffice to raise the inference." *Nolley v. Swiss Reinsurance Am. Corp.*, 857 F. Supp. 2d 441, 461 (S.D.N.Y. 2012) (Title VII retaliation case citing state-law whistleblower, Americans with Disabilities Act, and section 1983 retaliation cases). Here, there is no doubt that Tompkins' protected conduct of reporting the icy conditions at Croton Harmon was close in time and similar in subject matter to the disciplinary charges related to his refusal to walk in those conditions. But Tompkins produces no evidence showing that it was not the latter of these behaviors which formed the sole basis of those disciplinary proceedings against him. Indeed, the disciplinary record makes abundantly clear that Tompkins "was not disciplined for raising a safety issue." (Dkt. No. 31-25 at 6–7.) Instead, he was disciplined based on "a legitimate expectation by an employer that when orders are given employees will comply." (*Id.*) Thus, even to the extent that Tompkins' complaint regarding the wintry conditions at Croton Harmon overlaps temporally and substantively with the railroad's disciplinary actions against him, "[t]he evidence in the record is overwhelming that [plaintiff] was not disciplined because []he complained about safety, but solely because []he was argumentative and defied h[is] supervisor's instructions." *See Brisbois v. Soo Line R.R. Co.*, No. 15 Civ. 0570, 2016 WL 7423387, at *5 (D. Minn. Dec. 22, 2016), *appeal filed*, No. 17-1144 (8th Cir. Jan. 19, 2017) (granting summary

judgment to FRSA defendant on plaintiff's claim that discipline for "insubordination" following plaintiff's refusal to follow instructions was retaliation for her initial safety complaint).

A similar result is warranted with respect to Count II. It may be that *Gunderson* factor three weighs against the railroad with respect to Count II because an arbitration panel overturned Tompkins' suspension for threatening his supervisor. *See Gunderson*, 850 F.3d at 969. But factors one and two weigh far more strongly in the railroad's favor given the many "intervening event[s] that independently justified adverse disciplinary action." *Id*. (internal quotation marks omitted). The allegations at issue in Count II were based entirely on Tompkins' alleged threats to a supervisor, not his safety complaints, and relevant intervening events include not only Tompkins' insubordination for refusing to walk to the Wheel True, but also all of the subsequent disciplinary proceedings related to that insubordination and his initiation of the lunchroom confrontation with his supervisor.

It is worth emphasizing that even if the Court were to assume that Tompkins faced the discipline at issue in Count II solely in retaliation for his having refused to walk to the Wheel True, this would be insufficient to support his FRSA claim, because that refusal was itself not protected conduct. Thus viewing the evidence in the light most favorable to Tompkins leads only to the conclusion that "[t]o the extent that [Tompkins] was disciplined, . . . it was not for a reason prohibited by the FRSA; it was because of his failure to adhere to the [railroad's] policies and his unauthorized" and unprotected refusal to walk to his worksite on January 18, 2014. *Lockhart*, 266 F. Supp. 3d at 665. Accordingly, summary judgment is warranted with respect to Count II as well.[6]

---

[6] The railroad does not move for summary judgment on Count II with respect to factor three of Tompkins' prima facie burden, which requires a showing that Tompkins "suffered an unfavorable personnel action." *Hernandez*, 74 F. Supp. 3d at 579. Still, the Court notes the

### B. Tompkins' Civil Conspiracy Claim (Count III)

Metro-North moves for summary judgment with respect to Count III (Dkt. No. 36 at 23–25), in which Tompkins brings a civil conspiracy claim premised on Metro-North employees' having "entered into an agreement to violate [his] federal rights." (Dkt. No. 1 ¶ 82.) There are several reasons why dismissal of Tompkins' civil conspiracy claim is proper as a matter of law. First, because all of Metro-North's alleged coconspirators are its own employees, Tompkins' civil conspiracy claim is barred by the intracorporate conspiracy doctrine. *See Bereswill v. Yablon*, 6 N.Y.2d 301, 305 (1959) ("While it is entirely possible for an individual and a corporation to conspire, it is basic that the persons and entities must be separate."); *see also Satin v. Satin*, 414 N.Y.S.2d 570, 570 (App. Div. 1979). Second, as Tompkins' underlying federal claims have been dismissed, his remaining civil conspiracy claim must be dismissed as well because "[t]here is no tort of civil conspiracy in and of itself . . . [absent] an independent tort." *Satin,* 414 N.Y.S.2d at 570. Finally, Tompkins' state-law conspiracy claim is likely preempted by the FRSA, because the claim "would embroil the court in questions of whistle-blowing and railway safety, which the FRSA preempts." *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 424 (2d Cir. 2006). For all of these reasons, summary judgment in favor of the railroad with respect to Count III is appropriate.

### IV. Conclusion

For the foregoing reasons, Metro-North's motion for summary judgment is GRANTED.

---

absence of any such showing: The parties do not dispute that the suspension at issue in Count II was subsequently overturned by an arbitration panel, Tompkins received back pay for time missed during the pendency of these charges, Tompkins has since returned to work for the railroad in the same capacity as before the incident, and Tompkins has made no showing regarding any psychological damages or emotional distress. (Dkt. No. 38 ¶¶ 147–48, 151.)

The Clerk of Court is directed to close the motion at Docket Number 30 and to close this case.

SO ORDERED.

Dated: September 24, 2018
       New York, New York

_____
J. PAUL OETKEN
United States District Judge